UNITED STATED BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
Honorable Howard R. Tallman

In re:                                    )
                                          )
Stacey Lynn Sinischo,                     )   Case No. 15-19535 HRT
                                          )   Chapter 13
Debtor.                                   )
                                          )
_____   )

**ORDER ON CREDITORS' MOTION TO CONVERT TO CHAPTER 7 AND DEBTOR'S MOTION FOR VOLUNTARY DISMISSAL**

THIS MATTER came before the Court on the following motions:

(1) Motion to Convert Case from Chapter 13 to Chapter 7 filed by creditor Yellow Dog Properties, Inc. ("Yellow Dog") (docket #139) (the "Motion to Convert"), creditor Kelly Sparks' Joinder in the Motion (docket #144), creditor Sam Turner's Response in Opposition to the Motion (docket #151), and Debtor's Objection (docket #153);

(2) Debtor's Motion for Voluntary Dismissal under 11 U.S.C. § 1307(b)[1] ("Motion for Voluntary Dismissal") (docket #145), and Yellow Dog's Objection (docket #147); and

(3) Motion to dismiss filed by Chapter 13 Trustee Douglas Kiel ("Trustee") (docket #163).

The Court held an evidentiary hearing on these motions and took the matter under advisement. After considering the testimony, evidence, and arguments presented by the parties, the Court is ready to rule.

I.  Procedural History

Debtor filed her petition under Chapter 13 of the Bankruptcy Code on August 25, 2015, represented by counsel Michael Noyes.[2]  She listed three properties on Schedule A: 1) 3805 Roxbury Court in Colorado Springs (the "Roxbury Property"); 2) 1509 23rd Lane in Pueblo (the "Pueblo Property"); and 3) 7383 Tilden Street in Colorado Springs (the "Rental Property").  The only debts listed on her schedules included a secured debt on the Roxbury Property payable to Fifth Third Bank (the "Bank"), a secured debt on the Rental Property payable to Nationstar

_____

[1]  Unless otherwise indicated, all future statutory references are to Title 11 of the United States Code.

[2]  Noyes filed a motion to withdraw on May 2, 2016 (docket #133).

Mortgage, and a secured debt on her vehicle payable to USAA. She listed zero secured or unsecured debt on the Pueblo Property. Debtor also claimed two homestead exemptions of $75,000 each, one for the Roxbury Property and one for the Pueblo Property. She represented she was employed in "project management" for her business, LuRox Homes, and her 2015 year-to-date income was $61,253 from LuRox Homes and $2,800 from creditor Yellow Dog.

With the petition, Debtor filed a skeletal Chapter 13 plan (Plan #1) proposing a payment of $1,013 for one month (to pay attorney and trustee fees), and payments to the Bank on the Roxbury Property outside the plan. Plan #1 was withdrawn the next day, with a motion to extend time to file an "accurate" plan. On September 8, 2015, Debtor filed another plan (Plan #2), which proposed a $38,000 default to the Bank to be cured over 60 months, and a monthly plan payment of $734. Plan #2 immediately drew objections from the Bank and the Trustee, with the Bank stating the amount of the arrearage to be cured was incorrect. The Trustee's objection (docket #18) noted Debtor had failed to include Debtor's business valuation, and had erroneously claimed two homestead exemptions when one property was an investment property. The Trustee also contended the plan did not comply with the best interests of creditors test, that Debtor was not committing all disposable income to plan payments, and that the plan may not be proposed in good faith. Finally, the Trustee noted that a monthly mortgage payment of $3,146 was excessive for Debtor's reported household size of one.

Debtor filed another plan on October 23, 2015 (Plan #3). The only change in Plan #3 was to correct the amount owing to the Bank. The Trustee filed an objection to Debtor's homestead exemption, again noting Debtor had claimed the objection in an investment property where she did not reside. The Trustee also filed an objection to Plan #3 (docket #31), restating his prior objections and also contending Debtor failed to include rental income or provide for the secured claim of her ex-husband, William Sinischo, in the Roxbury Property.

The Bank moved for relief from stay on the Roxbury Property on November 23, 2015. One day later, Debtor amended her schedules for the first time. On Schedule B, she listed LuRox Homes as a sole proprietorship with a value of zero. She amended Schedule C to claim only one homestead exemption, in the Roxbury Property. Debtor also amended Schedules I and J to reflect additional income, both from LuRox and from the Rental Property.

On December 1, 2015, the United States Trustee filed a Report of Debtor Audit performed under 28 U.S.C. § 586(f)(1) (docket #47). The report found a material misstatement, in that Debtor had under-reported her gross monthly income by $1,481.

A stipulation entered into by the Bank, the Debtor, and the Trustee resolved the Bank's motion for relief from stay on the Roxbury Property on December 21, 2015. On January 7,

2016, creditor Sam Turner filed Proof of Claim #6 in the amount of $44,438, based on promissory notes and two deeds of trust on the Pueblo Property, recorded in December 2014.[3]

Debtor then filed another amended plan (Plan #4) on January 11, 2016, which increased her proposed payment to $871 monthly, and included language in Section V.G. as follows:  "No payment or provision is made to pay ex-husband William Sinischo. The debtor does not believe that she owes him money.  No payment is made to pay Sam Turner.  The debtor does not believe that she owes him money." (Docket #65, page 8).  The Trustee objected to Plan #4 because he "could not administer the language in V.G. regarding two secured claimants."  (Docket #77).

Creditor Claudia Banza then filed Proof of Claim #7 on January 15, 2016, in the amount of $29,336.25, based on an October 2014 promissory note and deed of trust on the Pueblo Property.  Debtor filed motions to disallow both Turner's and Banza's proofs of claim as late-filed. These motions were denied at a status conference on April 13, 2016 (docket #121).

In late February, creditor Yellow Dog filed several motions, asserting it had not received notice of the bankruptcy and was entitled to file a late proof of claim, citing *United States Internal Revenue Svc. v. Cole*, 146 B.R. 837, 839 (D. Colo. 1992). Yellow Dog also moved to compel Debtor to accept or reject an executory contract under Fed. R. Bankr. P. 6006.[4]  In March, creditor Kelly Sparks moved to file a late claim based on lack of notice of the bankruptcy.  The Court subsequently granted both creditors leave to file the late claims (docket #96 and #109).

Debtor amended her schedules again on March 16, 2016, adding, for the first time, creditors Sam Turner, Claudia Banza, Yellow Dog, and Kelly Sparks.  Turner and Banza were listed as secured creditors, with Banza having a deed of trust,[5] executed in October 2014, on the Pueblo Property securing a debt of $25,000, and Turner having two deeds of trust, executed in December 2014, on the Pueblo Property securing a total debt of $35,000.  Kelly Sparks was listed as an unsecured creditor for $30,000, with no information provided as to when the debt was incurred.  Yellow Dog's claim was listed as "Unknown" and as being incurred in 2015.

Creditor Sparks then objected to Debtor's latest filed plan (Plan #4), noting the plan provided only $650 would be paid out under Plan #4 to unsecured creditors, when Debtor

---

[3]  Turner also re-recorded the Deeds of Trust on June 10, 2016.  (Ex. 33). This recording occurred after the petition date.  Depending on the circumstances, that act could be a violation of the automatic stay, rendering the re-recording void.  *See In re Taylor*, 422 B.R. 270 (Bankr. D. Colo. 2009).  However, the Court need not resolve that issue in the present case.

[4]  After the Debtor filed a response rejecting the contract, the Court granted the motion and deemed the contract rejected in its Order at docket #96.

[5]  It appears from the record this deed was not recorded.

indicated in Plan #4 that the value of her interest in non-exempt property was $181,200.  On the same day that Sparks' objection to Plan #4 was filed, Debtor filed an amended plan (Plan #5) (docket #119, filed April 12, 2016) which contained a new, expanded, section V.G.  That section provided: "no payment will be made to the following under any circumstance as the Debtor does not believe a debt is owed: William Sinischo (ex-husband), Thomas Lewis (ex-husband), Sam Turner (business associate), and Yellow Dog (construction services provided to them)."  Debtor also stated the Pueblo Property was an "incomplete construction project" that she would either refinance or "gain further investor proceeds" to fund completion of the home, at which time it would be sold to pay "allowed" creditors.   Debtor then moved to avoid William Sinischo's lien on the Roxbury Property.

In May 2016, several events occurred in quick succession.  Debtor's attorney moved to withdraw on May 2, citing "irreconcilable differences."   On May 10 and 11, objections to Debtor's Plan #5 were filed by the Trustee, Sparks, Turner, and Yellow Dog.  The Trustee asserted Debtor was not current on plan payments,  Trustee could not administer the plan as written, and the plan still proposed to pay an arrearage to the Bank even though the Bank's order for relief from stay had been granted.  Sparks renewed her objections to the prior plan.  Sparks also contended that when Debtor borrowed $30,000 from her, Debtor represented the money would be used to fund completion of the Pueblo Property, and had not explained why the project was still unfinished.  In Turner's objection, he noted Debtor had failed to list his secured debt on the Pueblo Property on her petition, and that despite the Court's order allowing his claim as late-filed, the plan stated no payment would be made to him. Finally, Yellow Dog argued the plan was not in the best interests of creditors and not feasible.

On May 11, Yellow Dog filed the Motion to Convert, arguing Debtor had unreasonably delayed in proposing a confirmable plan, which was grounds to convert under § 1307(c).  Yellow Dog also noted Debtor had filed the plan to stop a foreclosure of her primary residence, the Roxbury Property, but "on or about May 4, 2016, Debtor filed a Notice of Intent to Cure with the El Paso County Public Trustee in connection with the pending foreclosure. Debtor's assertion that she intends to cure her default via the Public Trustee's cure process is inconsistent with her proposal to resolve the default by way of a Chapter 13 Plan."   Yellow Dog contended Debtor's assets could be liquidated in a Chapter 7 case, and utilized for the satisfaction of creditors' claims.

Sparks joined in Yellow Dog's Motion to Convert the next day, agreeing Debtor's delay was prejudicial to creditors, and also specifically alleging bad faith, stating:

Since this case was filed, multiple creditors have come forward who received no notice of the bankruptcy, several lawsuits and claims against the

Debtor and counter claims by the debtor have emerged, and three[6] unconfirmable plans have been filed which do not reflect the true state of the Debtor's financial affairs. These undisclosed debts and disputes indicate that this case was filed in bad faith as a scheme to delay, hinder, and defraud creditors. "[G]ood faith inquiries have traditionally been encompassed by § 1307(c). While lack of good faith is not expressly mentioned, a lamentable waste of judicial resources would result from allowing Chapter 13 cases filed in bad faith to progress to confirmation...." *In re Armstrong*, 303 B.R. 213, 221 (BAP 10th Cir. 2004).

Meanwhile, yet another creditor, J.J. Construction and Roofing, LLC, filed a proof of claim and an objection to Plan #5 on May 11. That creditor also had not been listed on the petition as having a secured debt on the Roxbury Property in the amount of $44,159, under a contract signed by Debtor in July 2015 for a new roof. The objection alleged a lack of good faith under § 1325(a)(3) and as well as a failure to satisfy § 1325(a)(4).[7]

Faced with mounting objections to her fifth proposed plan of reorganization and a motion to convert based on bad faith filed by two creditors, Debtor filed her Motion for Voluntary Dismissal on May 20, 2016, arguing that dismissal, rather than conversion to Chapter 7, was appropriate because:

This case was originally filed to solve one issue only; the Mortgage arrears owed to Fifth Third Bank on the Debtor's Roxbury property in Colorado Springs. After filing other creditors came forward. It is easy to just glance at the additional creditors and presume the Debtor was not forthright. However, a closer inspection reveals legitimate reasons why not only were they not listed, but also why *this case should be dismissed because State Courts are the proper forum for their rights and remedies.* (Emphasis added).

Yellow Dog objected to Debtor's motion for voluntarily dismissal, arguing Debtor's "plan outside of bankruptcy" would allocate to the Debtor the "sole and unfettered discretion to determine who she deems the legitimate creditors to be." Creditor Sam Turner then filed a response in opposition to Yellow Dog's motion, stating Debtor had an absolute right to dismiss her case under § 1307(b).

On June 13, 2016, the Trustee moved to dismiss for failure to make plan payments, noting the total paid into the plan through June 2016 was $3,526.00, with the last payment

---

[6]  Plan #5 was entitled "Third Amended Plan" even though it was Debtor's fifth proposed plan.

[7]  This provision provides that the value of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate were liquidated under chapter 7.

having been received by the Trustee on March 3, 2016.  Payment of $4,184.00 was required to be current through June 2016.  Trustee had previously moved to dismiss for failure to make plan payments on February 10, 2016 (docket #81).

## II.  Factual Background

At the August 1 hearing, Debtor testified her main source of income was from a remodeling business, LuRox Homes.  She advised her business partner, Scott Anderson, had filed articles of incorporation for LuRox Homes with the Colorado Secretary of State in May 2016, but previously she had operated LuRox Homes as a sole proprietorship.  She further testified she lived in the Roxbury Home with Anderson and his children from a prior marriage, as well as a renter.

Debtor initially stated her year-to-date income listed on her petition, in the amount of $61,253 from LuRox Homes, was accurate.  When presented with two 2015 Form 1099s (Ex. 24 and 25) provided by Yellow Dog, which showed combined income of $129,000, she advised those forms were accurate, but were for income she earned after filing for bankruptcy in August 2015.  She admitted she never amended her schedules to show this additional income from 2015.

Debtor also testified that, other than Yellow Dog, she had no other clients or sources of income throughout  2015.  Upon further questioning, however, she admitted she had also done work for creditor Sam Turner on a different property located in Pueblo.  She could not remember how much income she received from the project because it was "convoluted."

Debtor was impeached multiple times during the hearing regarding the security interests she had granted in the Pueblo Property.  In response to questioning from Yellow Dog's counsel, Debtor testified as follows:

Yellow Dog's Counsel: Did you represent in your bankruptcy petition whether anyone had a security interest in the property?

Debtor: I did not.

Counsel: You represented that no party had a security interest?

Debtor:  No, I did not represent that no party had an interest in it, I did not represent that there were parties that had interests in that property.  I didn't just deny that there were parties that had interest in the property, I just was not forward about that information.

Counsel: Could I have you look at page 14 of your petition please?  You list the amount of the secured debt as "zero."

Debtor: Yes.

Counsel: Did you also grant Kelly Sparks a security interest in that property?

Debtor: It is not secured by the property, no.  It was a promissory note.  It is not through a deed of trust.  It is for work done on that property.

Counsel: Can you look at Exhibit 30 please.  Can you identify it?

Debtor: Yes, it's the promissory note to Kelly.

Counsel: Item number 6 on the first page, does it indicate that this note is secured by 1509 23rd Lane in Pueblo?

Debtor:  Correct.

Counsel: Does it also indicate it is also secured by 422 S. Birdie Drive in Pueblo?

Debtor: Yes.

Counsel: So according to this document, you had given Ms. Sparks a security interest on the property at 1509 23rd Lane in Pueblo and the property at 422 S. Birdie Drive in Pueblo?

Debtor: Which is the property I was doing the work on to repay the debt to Sam Turner.

Counsel: Did you own that property?

Debtor: No.

Counsel: Have you ever owned that property?

Debtor: No.

Counsel: But you granted Ms. Sparks a security interest in property you did not own? [8]

Debtor: I am unable to grant a security interest in property that I don't own.

Counsel:  But would you agree that this document represents that this property served as security for the $30,000 loan?

Debtor:  Yes, I would agree that is what it says.

---

[8]  Creditor Sam Turner testified he had not learned until the hearing that Debtor had pledged Turner's property as collateral in order to borrow money from Kelly Sparks.

Counsel: Would you agree that when you filed your bankruptcy petition you did not list any unsecured creditors?

Debtor: Yes.

Debtor eventually admitted she had borrowed money from Sam Turner and signed the two deeds of trusts securing the Pueblo Property.  She admitted she had borrowed the money from Sparks, but asserted she planned to pay Sparks back as an "allowed creditor."  She further admitted she borrowed money from Claudia Banza and granted Banza a security interest in the Pueblo Property.

Regarding the two homestead exemptions she initially claimed on her petition, Debtor testified as follows:

Counsel: And at that time [of petition filing], where were you residing?

Debtor: At 3805 Roxbury Court.

Counsel: And you were not residing at the Pueblo Property?

Debtor: I was not.  I would stay there while work was being completed from time to time, but I was not living there permanently.

Sparks' counsel focused on omissions in Debtor's petitions and numerous proposed plans.  Debtor admitted she did not list Kelly Sparks on any schedules until March 2016, or on any plan until Plan #5 was filed in April 2016.  She admitted the Promissory Note she signed in April 2015 to Sparks was to be paid on October 8, 2016 (approximately two months after the bankruptcy filing).

Kelly Sparks testified that when she lent Debtor $30,000 in April 2015, Sparks was recently divorced.  Sparks invested the funds, received from the divorce and intended for retirement, in the Pueblo Property, in order to improve and sell it.  She testified she understood the debt was secured by the Pueblo Property as well as the property at Birdie Drive in Pueblo. Sparks further testified she did not learn of the bankruptcy until she was informed by another creditor.

The testimony of Chris Jones, President of Yellow Dog, contradicted Debtor's testimony in several respects.  While Debtor testified she had not received the income reflected in Yellow Dog's 1099s until after the petition date, Mr. Jones testified Debtor had earned that income before filing for bankruptcy in August 2015.  Jones testified he and Debtor had entered into a contract (Ex. 26) under which Debtor was to complete work by August 24, 2015, and she had failed to timely complete the work.  The contract provided for penalties for late work that were due to begin on August 25, 2015, the day Debtor filed for bankruptcy.

<u>III.  Discussion</u>

A.    <u>The Absolute Right Debate</u>: Conflicting case law over the absolute right to dismiss versus conversion to Chapter 7 for bad faith.

   1. *Pre-2007 Cases*

Section 1307(b) of the Bankruptcy Code provides:

   On request of the debtor at any time, if the case has not been converted under section 706, 1112, or 1208 of this title, the court shall dismiss a case under this chapter. Any waiver of the right to dismiss under this subsection is unenforceable.

11 U.S.C. § 1307(b).

   Section 1307(c) provides:

   [O]n request of a party in interest or the United States trustee and after notice and a hearing, the court may convert a case under [chapter 13] to a case under chapter 7 of this title, or may dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause....[9]

11 U.S.C. § 1307(c).

   Courts have found these two provisions at odds with each other when, as here, a chapter 13 debtor requests voluntary dismissal after a motion to convert has been filed by a party in interest or a trustee.  The dilemma has divided the courts, with some holding a debtor has an absolute right to dismiss her chapter 13 case under § 1307(b), notwithstanding a pending motion to convert under § 1307(c),[10] and others holding a bankruptcy court retains the power to convert

---

   [9] Bad faith in filing a Chapter 13 petition qualifies as "cause" under the statute.  *In re Gier*, 986 F.2d 1326, 1329 (10th Cir. 1993).

   [10] *See Ross v. AmeriChoice F.C.U.*, 530 B.R. 277 (E.D. Pa. 2015); *In re Mills*, 539 B.R. 879, 884 (Bankr. D. Kan. 2015); *In re Fisher*, 2015 WL 1263354 (Bankr. W.D. Va. March 19, 2015); *In re Procel*, 467 B.R. 297, 308 (S.D.N.Y. 2012) (citing *Barbieri v. RAJ Acquisition Corp. (In re Barbieri),* 199 F.3d 616, 619 (2d Cir.1999)); *In re Darden*, 474 B.R. 1, 7 (Bankr. D. Mass. 2012); *In re Williams*, 435 B.R. 552 (Bankr. N. D. Ill. 2010); *In re Sickel*, 2008 WL 5076981 (Bankr. D.D.C. 2008);  *In re Campbell*, No. 07–457, 2007 WL 4553596, at *1 (Bankr.N.D.W.Va. Dec. 18, 2007); *Zeman v. Dulaney (In re Dulaney)*, 285 B.R. 10 (D. Colo. 2002).

a case under § 1307(c), even in the face of a debtor's request for dismissal under § 1307(b).[11] As of this writing, there is no Supreme Court or Tenth Circuit authority[12] on this issue. *See In re Mills,* 539 B.R. 879, 884 (Bankr. D. Kan. 2015).

In the recent case of *Ross v. AmeriChoice F.C.U.*, 530 B.R. 277 (E.D. Pa. 2015), the court succinctly summarized the split in authority, prior to 2007, as follows:

> Prior to 2007, the absolute right debate was defined by two decisions from separate Courts of Appeal. On the one hand were courts that found an absolute right to voluntarily dismiss under § 1307(b). The reasoning behind these decisions was espoused by the Second Circuit Court of Appeals in the case of *In re Barbieri*, 199 F.3d 616 (1999). There, the Second Circuit ruled that "a debtor has an absolute right to dismiss a Chapter 13 petition under § 1307(b), subject only to the limitation explicitly stated in that provision." *Id.* at 619. The decision focused on the language of § 1307(b), noting that it "unambiguously requires that if a debtor 'at any time' moves to dismiss a case that has not previously been converted, the court 'shall' dismiss the action." *Id.* It went on to note that "[t]he term 'shall,' as the Supreme Court has reminded us, generally is mandatory and leaves no room for the exercise of discretion by the trial court." *Id. (citing Anderson v. Yungkau*, 329 U.S. 482, 485, 67 S.Ct. 428, 91 L.Ed. 436 (1947)). It also noted that this interpretation was consistent with the purely voluntary nature of Chapter 13 proceedings. *Id.* at 620.
>
> . . . .
>
> On the other side of the debate were those courts that found a bad faith exception to a debtor's right to voluntarily dismiss. The Eighth Circuit Court of Appeals' decision *In re Molitor*, 76 F.3d 218 (1996) is indicative of this position. There, the Eighth Circuit ruled that a debtor could not escape an allegation of bad faith simply by voluntarily dismissing a Chapter 13 petition. *Id.* at 220. Rather than focus on the statutory language, the Eighth Circuit "look[ed] to the overall purpose and design of the statute as a whole ...." *Id.* It noted that "the purpose of the bankruptcy code is to afford the honest but unfortunate debtor a fresh start, not to shield those who abuse the bankruptcy process in order to avoid paying

---

[11]  *See In re Brown*, 547 B.R. 846 (Bankr. S. D. Ca. 2016);  *In re Mitrano*, 472 B.R. 706, 710 (E. D. Va. 2012); *In re Kotche*, 457 B.R. 434, 440 (Bankr. D. Md. 2011); *In re Jacobsen*, 609 F.3d 657 (5th Cir. 2010); *In re Armstrong*, 408 B.R. 559, 569 (Bankr. E. D. N. Y. 2009); *In re Rosson*, 545 F.3d 764 (9th Cir. 2008)*;In re Letterese*, 397 B.R. 507, 512 (Bankr. S. D. Fla. 2008); *Molitor v. Eidson (In re Molitor)*, 76 F.3d 218, 220 (8th Cir.1996).

[12]  The United States District Court for the District of Colorado ruled on this issue, prior to the passage of BAPCPA, in *In re Dulaney*, 285 B.R. at 10.  District Court decisions are persuasive, but not binding, on bankruptcy courts in the same district.  *In re Karr Dev. Assoc*., 180 B.R. 629, 640 (Bankr. D. Kan. 1995).

their debts." *Id.* It concluded that allowing a debtor "to respond to a motion to convert by voluntarily dismissing his case with impunity would render section 1307(c) a dead letter and open up the bankruptcy courts to a myriad of potential abuses." *Id.*

*Ross,* 530 B.R. at 284.

2. *Post-2007 Cases*

In 2007, the Supreme Court decided *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365 (2007). The issue in *Marrama* was whether a debtor has an absolute right to convert a Chapter 7 proceeding to a Chapter 13 proceeding even if the debtor has engaged in bad faith. The Supreme Court held the "absolute right" to convert a case from Chapter 7 to Chapter 13 under § 706(a)[13] is possessed only by "[t]he class of honest but unfortunate debtors" who seek "the chance to repay their debts should they acquire the means to do so." *Marrama* at 374. The Supreme Court reasoned that the class of eligible Chapter 13 debtors does not include an "atypical" debtor whose bad faith demonstrates he is not entitled to relief afforded to a good faith debtor. *Id.* The Supreme Court concluded a debtor's right to convert a case under § 706(a), when coupled with bad faith conduct, is not absolute. *Id.*

Subsequently, some courts read *Marrama* to support a bad faith exception to § 1307(b). The Ninth Circuit Court of Appeals, in *In re Rosson*, 545 F.3d 764, 772 (9th Cir. 2008), declared "[a]fter *Marrama* ... the 'absolute right' position [of § 1307(b) dismissal] is no longer viable."[14] The Fifth Circuit Court of Appeals cited *Marrama* to "hold that the right to dismiss under 11 U.S.C. § 1307(b) is subject to a limited exception for bad-faith conduct or abuse of the bankruptcy process ...." *In re Jacobsen*, 609 F.3d 647, 649 (5th Cir. 2010). Like the Ninth Circuit, the Fifth Circuit found there to be "no analytical distinction" in the statutory language of § 706(a) and § 1307(b). *Id.* at 660.

Other courts came down on the opposite side, concluding the *Marrama* decision did not affect § 1307(b). *See, e.g., In re Procel*, 467 B.R. 297, 308 (S.D.N.Y. 2012) ("[T]his Court is bound by the holding in *Barbieri* that the right of voluntary dismissal under § 1307(b) is absolute."); *In re Darden*, 474 B.R. 1, 7 (Bankr. D. Mass. 2012) ("[Section] 1307(b) gives a debtor an absolute right of dismissal."); *In re Williams*, 435 B.R. 552, 560 (Bankr. N. D. Ill. 2010) ("[T]he language of § 1307(b) accords debtors an unlimited right to dismissal of unconverted Chapter 13 cases, and ... that right is not limited by judicial discretion or other provisions of the Bankruptcy Code...."); *In re Campbell*, No. 07–457, 2007 WL 4553596, at *1

---

[13] That section provides: "The debtor may convert a case under this chapter to a case under chapter 11, 12, or 13 of this title at any time, if the case has not been converted under section 1112, 1208, or 1307 of this title. Any waiver of the right to convert a case under this subsection is unenforceable."

[14] *Rosson* was recently followed in *In re Brown*, 547 B.R. 846 (Bankr. S.D. Ca. 2016).

(Bankr.N.D.W.Va. Dec. 18, 2007) ("[T]he Debtor has an absolute right to dismiss his Chapter 13 case....").

Adding another wrinkle to the split of authority, in 2014 the Supreme Court decided *Law v. Siegel*, 134 S.Ct. 1188 (2014). While that case did not involve § 1307(b) or §706(a), the Supreme Court briefly revisited its *Marrama* decision, stating *"Marrama*'s dictum suggests that in some circumstances a bankruptcy court may be authorized to dispense with futile procedural niceties in order to reach more expeditiously an end result required by the Code. *Marrama* most certainly did not endorse, even in dictum, the view that equitable considerations permit a bankruptcy court to contravene express provisions of the Code." *Id.* at 1197. The issue in *Law* was whether a bankruptcy court could use its powers under § 105(a) to surcharge a debtor's exempt homestead when the debtor committed fraud to conceal the homestead's value from the trustee. The Supreme Court reasoned that allowing the bankruptcy court to do so would add additional exceptions to § 522: "The Code's meticulous—not to say mind-numbingly detailed—enumeration of exemptions and exceptions to those exemptions confirms that courts are not authorized to create additional exceptions." *Id.* at 1196.

Post- *Law v. Siegel*, two bankruptcy courts have analyzed the chapter 13 debtor's right to dismiss her case after a creditor's motion to convert has been filed. In *In re Mills*, 539 B.R. 879 (Bankr. D. Kan. 2015), the court followed the "absolute right to dismiss" line of cases, concluding the debtor could voluntarily dismiss her case after a motion to convert was filed. The *Mills* court reasoned as follows:

> The narrow view of *Marrama*'s interpretation of § 706(a) taken by the *Law v. Siegel* Court makes sense. That section provides that the debtor "may" convert a chapter 7 case to one in chapter 13 if the debtor has not already converted the case to chapter 7 from another chapter. Section 706(d) appends a further limitation to the privilege of voluntary conversion: a chapter 7 debtor may not convert a case to a chapter for which he is not eligible. By contrast, § 1307(b) mandates dismissal on the debtor's request by using the words "at any time" and "shall." It only limits the debtor's ability to dismiss cases that have previously been converted to chapter 13 from chapters 7, 11, or 12. This court should not use § 105(a) to rewrite the mandatory provisions of § 1307(b).

*In re Mills*, 539 B.R. at 884.

The bankruptcy court in *In re Brown*, 547 B.R. 846 (Bankr. S.D. Ca. 2016), interpreted *Law* differently:

> The Supreme Court in *Law*, 134 S.Ct. at 1194, took pains to emphasize the continuing vitality of *Marrama*, 549 U.S. at 367, 127 S.Ct. 1105, with a specific reference to the function of § 1307(c) in prohibiting debtors from benefitting from bad faith conduct, even though it was a Chapter 7 bankruptcy case where

§ 1307(c) was not directly applicable. This express emphasis in *Law*, 134 S.Ct. at 1194, on the importance of § 1307(c) in preventing abuse of the bankruptcy system, is certainly as important in Chapter 13 cases as it is in Chapter 7 cases.

*Brown*, 547 B.R. at 857.

The *Brown* court ultimately held the bankruptcy court had authority to convert the chapter 13 case to one under chapter 7 for bad faith despite the debtor's right under § 1307(b) to dismissal, observing "*Marrama* involved a debtor who sought to avoid problems in his Chapter 7 case by converting to a Chapter 13 case. . . . Brown is also a debtor who has acted in bad faith and is seeking to avoid the scrutiny of the Chapter 7 trustee, although this time through the avenue of dismissal instead of conversion. *Id.* at 851. The court went on to hold that "[t]his distinction is without a difference, however, since *Rosson*, 545 F.3d at 774, noted that *Marrama*, 549 U.S. at 368, left no basis for any analytical distinction between a debtor's dismissal rights under § 1307(b) and conversion rights in Chapter 7 cases under § 706(a)." *Id.*

In addition to *Mills* and *Brown*, one other bankruptcy court addressed the absolute right debate after *Law*, but not in the same procedural context. The court in *In re Fisher*, 2015 WL 1263354 (Bankr. W. D. Va.) was faced with a motion to dismiss filed by the debtor first, followed later the same day by a motion to convert filed by a creditor. The court specifically requested briefing from the parties on the applicability of *Law* to the relief requested in the competing motions. The *Fisher* court ultimately concluded the debtor maintained the absolute right to dismiss the case, relying heavily on the pre-*Law* case of *In re Williams*, 435 B.R. 552 (Bankr. N.D. Ill. 2010):

Section 1307(b) of the Bankruptcy Code provides that "[o]n request of the debtor at any time, if the case has not been converted under section 706, 1112, or 1208 of this title, the court shall dismiss a case under this chapter." Prior to *Law,* courts were divided as to whether a bad-faith debtor has an absolute right to dismiss a Chapter 13 case under Section 1307(b). See *Mitrano v. United States (In re Mitrano)*, 472 B.R. 706, 710 (E.D.Va. 2012). As explained herein, *Law* changed the playing field. Given the recent instruction of *Law*, this Court agrees that the framework and analysis of Section 1307(b) set forth in *Williams* sets the proper course.

*Fisher*, at *1.

The *Fisher* Court also observed that *Marrama* is distinguishable from cases dealing with the absolute right to dismiss under Section 1307(b):

First, *Marrama* interpreted Section 706(a), a provision which is similar to but not the same as Section 1307(b). Section 706(a) provides that a debtor "may " convert his case, while Section 1307(b) mandates that a court "shall " dismiss the unconverted case upon request. Second, there is no limiting provision on dismissal that mirrors the eligibility limitation of Section 706(d) which was

crucial in *Marrama*. The only arguably analogous eligibility provision in Section 1307 is subsection (g).   Section 1307(g),[15] however, only limits the ability of a debtor to convert his case—Section 1307(g) does not place any limitation on the absolute right of a debtor to dismiss his case under Section 1307(b). Furthermore, no other statutory provision limits the right to dismiss under Section 1307(b).

*Id.*

In *Williams*, the court was presented with a debtor's motion to dismiss filed after a creditor filed a motion to convert. While the *Williams* court acknowledged the issue had divided the courts, it viewed the issue as "straightforward."  The court explained:

> [T]he question is a straightforward one of statutory construction, which can be resolved in three steps. First, the language of § 1307(b) gives debtors in unconverted Chapter 13 cases an unqualified right to dismissal. Second, a court may not modify a statute simply because the court believes a different version would implement good policy; any limitation on § 1307(b) would have to come from another statutory provision. And third, no statutory provision applicable here limits the right to dismissal under § 1307(b).

*Williams*, 435 B.R. at 554.

In *Williams*, the bankruptcy court emphasized the voluntary nature of a chapter 13 proceeding, stating the debtor's "guaranteed right of dismissal preserves the freedom to choose between liquidation and debt adjustment."  *Id.* at 557.  The court also noted "applying §1307(b) according to its terms does not grant chapter 13 debtors immunity for misconduct ----- bad faith conduct is subject to a range of judicial sanctions after dismissal . . . and in some cases can be the basis for a criminal prosecution"  under 18 U.S.C. §§ 152 and 158(d).  *Id.* at 556.

Finally, post-*Law*, in  *Ross v. AmeriChoice Fed. Credit Union*, 530 B.R. at 277, the United States District Court for the Eastern District of Pennsylvania expanded on the considerations expressed by the *Williams* court, post-*Law*.  In *Ross*, the debtor had filed for chapter 13 a day before a sheriff's sale of his residence, delaying the sale. After the sale was rescheduled, the case was dismissed on motion of the chapter 13 trustee.  On the day that sale was rescheduled, debtor filed another chapter 13 case, again delaying the sale.  Debtor had filed incomplete documents and was given a six-week extension to file a plan and schedules.  In the interim, the creditor moved for relief from stay to proceed with foreclosure, which was granted.  One month after the stay was granted, the creditor moved to dismiss or convert based on bad faith.  The day before the hearing was scheduled, debtor filed a motion to voluntarily dismiss.  The next day, the bankruptcy court granted the creditor's motion to dismiss, dismissing the case with prejudice and enjoining debtor from filing another bankruptcy case without express permission from the bankruptcy court.

---

[15]  Section 1307(g) provides that notwithstanding any other provision in § 1307, a case may not be converted to another chapter, unless the debtor may be a debtor under such chapter.

On appeal, the United States District Court, after providing a thorough analysis of the absolute right debate, sided with "the line of cases recognizing an absolute right to dismiss under § 1307(b), *Marrama* notwithstanding." *Ross*, 530 B.R. at 287.  As in *Williams*, the appellate court emphasized the voluntary nature of chapter 13 proceedings and the availability of other sanctions upon the dismissal of the case.  Importantly, the court also held the absolute right to dismiss under the plain language of §1307(b) was not "self executing," observing:

> Moreover, while a debtor's right to dismiss under § 1307(b) is absolute, it is not unconditional or self-executing. *See In re Dilley*, 125 B.R. 189, 195 (Bankr. N.D. Ohio 1991) ("Section 1307(b) provides only that the Court shall dismiss the case. It does not state the implications of that dismissal...."). A debtor must request dismissal under § 1307(b) by formal motion. Fed. R. Bankr.P. 1017  ("Conversion or dismissal under ... § 1307(b) shall be on motion filed and served as required by Rule 9013."). The bankruptcy court can receive briefing and schedule a hearing on the request. *See Merritt*, 39 B.R. at 464 ("Although § 1307(b) gives the debtor an absolute right to dismissal if the case has not previously been converted, the section does not govern the time or manner by which the order of dismissal must be entered."). Creditors or the trustee can raise any concerns regarding a debtor's bad faith or abuse of the bankruptcy process at that time.
>
> Then, while the bankruptcy court must ultimately grant the debtor's motion and dismiss the case, it can do so with prejudice, and it can place conditions on the dismissal if it finds them appropriate. See, e.g., In *re Mangual*, No. 10–00124, 2010 WL 5185392, at *3 (Bankr. D. P.R.  Dec. 20, 2010) (granting § 1307(b) motion but barring debtors from filing another bankruptcy petition for one year).

*Ross*, 530 B.R. at 289.

Specifically, the *Ross* court noted  "[s]ufficient safeguards against abuse are already present without the need to evade the plain language of § 1307(b). Possible remedies include Rule 11 sanctions, allowing parties to pursue state law remedies, filing an involuntary petition under § 303, referring conduct to the United States Attorney's Office for possible criminal prosecution, and most importantly, conditioning the dismissal pursuant to 11 U.S.C. § 349.... *Id.* (Citing *In re Campbell*, No. 07–457, 2007 WL 4553596, at *4 (Bankr.N.D.W.Va. Dec. 18, 2007).

Ultimately, in *Ross*, the district court determined the bankruptcy court erred by dismissing Ross' Chapter 13 case pursuant to AmeriChoice's § 1307(c) motion rather than pursuant to Ross' § 1307(b) motion, but, because Ross' § 1307(b) motion was not self-executing, the bankruptcy court did not err in "continuing proceedings in the case" after Ross filed that motion.  *Id.*

B.  Parties' Arguments Concerning the Absolute Right Debate

In the instant case, the parties submitted briefs arguing each side of the absolute right debate.  Creditor Yellow Dog urges the Court to follow the line of cases finding a bad faith exception to the absolute right of dismissal under § 1307(b):

It is  entirely appropriate for this Court to join those which have interpreted § 1307 to allow bankruptcy judges to determine whether dismissal or conversion is in the best interest of creditors pursuant to 11 U.S.C. §1307(c), regardless of whether the debtor has requested a dismissal, where the debtor has acted in bad faith or abused the bankruptcy process. In the case at hand, the actions and omissions of Debtor as set forth in Yellow Dog's Motion to Convert to Chapter 7, and the Joinder to that Motion, constitute a pattern of bad faith and/or an abuse of the bankruptcy process. The Debtor's main reason for filing a Chapter 13 was to save her Roxbury home. Upon information and belief, Debtor has now cured her arrearage to Fifth Third Bank and the foreclosure has been withdrawn. Therefore, Debtor appears to have achieved her goal outside of the context of bankruptcy court, while simultaneously utilizing the Chapter 13 process to the detriment of her creditors, who have been unable to pursue their claims outside of bankruptcy court since this case was filed in August of 2015.

Creditor Kelly Sparks supports Yellow Dog's argument that a bad faith exception to the absolute dismissal right should be available to convert this case, observing:

At the status conference conducted on April 13, 2016, Debtor's counsel stated that this case did not start out as a complicated case. In truth, this case was a complicated case from the beginning, but only appeared uncomplicated because the Debtor has concealed a wide array of factual information from the Court and from her own attorney.

Creditor Sam Turner, who is the only creditor on the Pueblo Property secured by recorded deeds of trust, argues the case should be dismissed, rather than converted.  Turner's main argument is that the debtor is not eligible to be a debtor in Chapter 7 anyway, so the case cannot be converted:

11 U.S.C. § 1307(g) states, "Notwithstanding any other provision of this section, a case may not be converted to a case under another chapter of this title unless the debtor may be a debtor under such chapter." Prior to his recent retirement, the Honorable Sidney B. Brooks adopted the majority approach in holding that § 707(b) applies to cases converted from Chapter 13 to Chapter 7.  See *In re Burgher,*  539 B.R. 868 (Bankr. D. Colo. 2015). Here, pursuant to her petition, the Debtor's debts are primarily consumer debts; pursuant to Form 22C-1, she earns more than twice the median income for her household size; and pursuant to Form 22C-2, her monthly disposable income far exceeds the statutory limitations

contained in § 707(b)(2), such that she would not qualify as a Chapter 7 Debtor pursuant to § 707(b)(1).[16]

Finally, the Trustee asserts "a majority of case law supports the absolute right of dismissal, and relies on the pre-BAPCPA (and pre-*Marrama*) case of *Zeman v. Dulaney* (*In re Dulaney*), 285 B.R. 10 (D. Colo. 2002). In that case, Judge Walker Miller of the United States District Court for the District of Colorado upheld Judge Cordova's grant of the debtor's motion to dismiss his chapter 13 case filed after the chapter 13 trustee, and a creditor, had moved to convert. In *Dulaney*, the chapter 13 trustee argued "the mandatory dismissal language of § 1307(b) is not controlling when there is a pending § 1307(c) motion to convert to Chapter 7; in such instance, a court must consider both motions and cannot automatically grant the motion to dismiss. Otherwise, an absolute right to dismissal would allow a debtor, as here, to file a Chapter 13 case, receive protection from the automatic stay, delay confirmation and then move to dismiss the case when another party moves to convert to Chapter 7." The court noted the trustee had further suggested that "at the very least, § 1307(b) does not grant an absolute right to dismissal when the pending § 1307(c) motion to convert alleges bad faith, abuse of process or undue delay.*"

Judge Miller rejected the trustee's argument, instead relying on the "traditional tools of statutory interpretation: language, legislative history and purpose." *Id.* at 14. Specifically, the court focused on the use of the word "shall" in § 1307(b) versus the use of the word "may" in § 1307(c); noted that congressional reports "explicitly affirm that a debtor retains an absolute right to dismissal under § 1307(b)," and emphasized that the purpose of chapter 13, which "is to encourage voluntary petitions" was "served by preserving the debtor's right to dismissal in the face of a competing motion to convert to Chapter 7." *Id.* Finally, the *Dulaney* court recognized that bankruptcy courts retained the power to remedy misuse of chapter 13 appropriately, under either § 105(a) or Fed. R. Bankr. P. 9011(c).

After thoroughly reviewing the record in this case and the applicable case law, this Court has decided to apply the reasoning of the *Dulaney*, *Williams,* and *Ross* cases to the case at bar. The Court finds the statutory language of the Code, and the conflicting case law addressing this issue, compel the Court to dismiss the Debtor's chapter 13 case, rather than convert the Debtor's case to one under Chapter 7 for bad faith as discussed below. Dismissal of this case, with sanctions, will put the Debtor back in state court, where creditors can assert their remedies against her under state law.

---

[16] The Court does not reach this issue because the Court concludes that, in this case, Debtor's debts appear to be primarily business debts and not consumer debts. Because the Court is dismissing, rather than converting, Debtor's case, this issue need not be addressed here.

C. Grounds for Dismissal with Sanctions

The Court finds dismissal of this case with sanctions is appropriate because Debtor's petition and multiple plans were not filed in good faith. "To determine whether a Chapter 13 petition was filed in good faith and whether a proposed Chapter 13 plan was filed in good faith, courts employ a totality of the circumstances test. The factors for both good faith requirements are similar, but not identical." *In re Rodriguez*, 487 B.R. 275, 282 (Bankr. D. N.M. 2013); *see also In re Wark*, 543 B.R. 522, 533 n. 35 (Bankr. D. Kan. 2015) (noting the "analysis for whether a Chapter 13 petition was filed in good faith is the same—totality of the circumstances—as the analysis for whether a Chapter 13 plan was filed in good faith").

The Tenth Circuit has used the following factors to determine whether a Chapter 13 petition has been filed in good faith: (1) the nature of the debt, including the question of whether the debt would be nondischargeable in a Chapter 7 proceeding; (2) the timing of the petition; (3) how the debt arose; (4) the debtor's motive in filing the petition; (5) how the debtor's actions affected creditors; (6) the debtor's treatment of creditors both before and after the petition was filed; and (7) whether the debtor has been forthcoming with the bankruptcy court and the creditors. *In re Gier*, 986 F.2d 1326, 1329 (10th Cir. 1993).

1. Good faith filing of petition

The Court looks to the totality of the circumstances, including the following factors from *In re Gier*, 986 F.2d at 1329, to determine whether Debtor's Chapter 13 petition was filed in good faith:

(1) *The nature of the debt, including the question of whether the debt would be nondischargeable in a Chapter 7 proceeding.* Here, debt owed to several creditors may not be dischargeable if Debtor made material misrepresentations (such as pledging property in which Debtor had no ownership as security for loans). Further, the petition was clearly filed to stall the foreclosure of the Roxbury Property and thwart the actions of creditors (particularly Yellow Dog) on Debtor's other properties.

(2) *The timing of the petition.* The timing of the petition strongly indicates it was filed to stymie Yellow Dog's collection efforts, just as payment under the contract became due. The Debtor admits the petition was also filed to stop the foreclosure of the Roxbury Property, and that her other creditors, whether disputed or not, were not disclosed with the petition. The timing of these events strongly suggests the Chapter 13 petition was not filed in good faith. Debtor's tactics were "textbook examples of bad faith efforts to frustrate state court litigation." *See Ross* at 291.

(3) *How the debt arose.* Because Debtor's schedules were constantly changing, it is hard to determine how the debt arose, other than to say they arose out of property deals gone bad. The debts clearly are not the typical consumer-type debt that a Chapter 13 petition normally addresses. "Bad faith exists where the purpose of the bankruptcy filing is to defeat state court

litigation without a reorganization." *Forever Green Athletic Fields, Inc. v. Dawson,* 514 B.R. 768, 788 (E.D. Pa. 2014). Further, the use of a Chapter 13 plan to pay a small portion of a nondischargeable debt is subject to heightened scrutiny. *See, e.g., in re Lanham*, 346 B.R. 211, 214 (Bankr. D. Colo. 2006). Debtor did not treat her creditors, or her debts owed to them, fairly in her Chapter 13 filing.

(4) *The debtor's motive in filing the petition*. The evidence amply supports the conclusion that Debtor filed the Chapter 13 petition in order to stall the foreclosure of her Roxbury Property and hinder other creditors' attempts to collect their debts in state court. Other courts have recognized that timing a petition immediately before a foreclosure action shows a debtor's motive was primarily to evade a sale of her property. *See, e.g. In re Joobeen*, 385 B.R. 599, 611 (E.D. Pa. 2008).

(5) *How the debtor's actions affected creditors*. Debtor did not even inform several creditors of the bankruptcy, and instead ceased communication with them or misled them as to her financial circumstances. When these creditors subsequently learned of her bankruptcy case, the Debtor audaciously objected to their proofs of claims as late-filed. Debtor's actions have impeded her creditors' attempts to collect on potentially nondischargeable debts, for more than a year. Her creditors testified that her actions had caused them stress, worry, and expense.

(6) *The debtor's treatment of creditors both before and after the petition was filed*. Debtor filed this case to deal with a foreclosure, but ignored her other debt. Debtor continually misrepresented her true financial picture during her bankruptcy case. She failed to list creditors she was fully aware existed, and then objected to some of their late-filed proofs of claims. As to other creditors, after she eventually felt compelled to list them, she flatly stated they would not be paid. These delaying tactics and actions strongly indicate a lack of good faith.

(7) *Whether the debtor has been forthcoming with the bankruptcy court and the creditors*. Debtor has not been forthcoming with this Court and creditors. She admitted that even though she didn't own certain property at Birdie Drive, and "she was unable to grant a security interest in property she did not own," she in fact misrepresented to a creditor that she was granting a security interest in that property. Debtor's counsel essentially argued at the hearing that, while Debtor's actions were misleading, they were not truly "egregious."[17] Yet, as other courts have noted, "neither malice nor actual fraud is required to find a lack of good faith. The bankruptcy judge is not required to have evidence of a debtor's ill will directed at creditors, or that debtor was affirmatively attempting to violate the law— malfeasance is not a prerequisite to bad faith." *In re Sullivan*, 326 B.R. 204, 212 (BAP 1st Cir. 2005). As shown by her testimony on cross-examination, Debtor has not been forthcoming with the Court or with creditors during the overall course of these proceedings. Her conduct was egregious.

---

[17] The term "egregious" means "remarkable or extraordinary in some bad way." *Random House Webster's College Dictionary* (2000).

2. Good faith filing of plan

Good faith filing of a chapter 13 plan is evaluated on a "case-by-case basis" by examining the totality of the circumstances. *Flygare v. Boulden*, 709 F.2d 1344 (10th Cir. 1983). The Tenth Circuit, in *In re Cramer*, 697 F.3d 1314, 1318–19 (10th Cir. 2012), noted the Bankruptcy Code was amended in 2005 to include § 1325(b), which criteria subsumes most of the *Flygare* factors, and, therefore, the good faith inquiry now "has a more narrow focus." *Id.* A bankruptcy court must consider "factors such as whether the debtor has stated his debts and expenses accurately; whether he has made any fraudulent misrepresentation to mislead the bankruptcy court; or whether he has unfairly manipulated the Bankruptcy Code." *Id.; see also Robinson v. Tenantry (In re Robinson)*, 987 F.2d 665, 668 n. 7 (10th Cir.1993).

The Court looks to the following factors, articulated in *Cramer*, to determine whether Debtor's Chapter 13 plans were filed in good faith:

(1) *Whether the debtor has stated her debts and expenses accurately*. Debtor's lists of debts and expenses were far from accurate. She listed zero debt on the Pueblo Property, despite having pledged it as security on loans from three different creditors. The reporting of her income and expenses was seriously misleading, to the extent that the United States Trustee found a material misstatement, in the amount of $1,481 per month, when it conducted an audit.

(2) *Whether the debtor has made any fraudulent misrepresentation to mislead the bankruptcy court*. Debtor made fraudulent misrepresentations in her many filings with this Court. Debtor herself admitted at the hearing that "she was not forward" about information in her schedules. She further testified, under cross-examination from Sparks' counsel, that, as amended plans were filed, she actually had no intent to pay anything under the plans, but instead was planning to dismiss the case.

(3) *Whether Debtor has unfairly manipulated the Bankruptcy Code*. Debtor's woefully inaccurate reporting of debts, and failure to sufficiently explain discrepancies about income and expenses, creates an appearance of manipulation. Debtor sought to use her bankruptcy case for her own purposes without regard to her fiduciary duty to creditors or the responsibilities imposed on her by the Bankruptcy Code.

In sum, all of the factors indicate that Debtor filed both her Chapter 13 petition and multiple Chapter 13 Plans in bad faith. This Chapter 13 case is not an attempt at reorganization, but instead is primarily a tactic to delay or avoid the enforcement of debts, many of which could prove to be nondischargeable.

IV.  <u>Conclusion</u>

The Court finds that § 1307(b) of the Bankruptcy Code requires that the Debtor's request to voluntarily dismiss her case must be granted, despite creditor requests under § 1307(c) that the case be converted to a case under chapter 7 for Debtor's bad faith.  In Debtor's Motion for Voluntary Dismissal under § 1307(b), she stated her case should be dismissed because state courts "are the proper forum" for creditors' "rights and remedies."   The Court will take Debtor at her word, but hold her to it by measures designed to ensure these matters are decided by the state courts. The Court, having determined that the Debtor filed her chapter 13 case and several Plans in bad faith, also finds grounds to impose conditions and sanctions in connection with the dismissal of the case.

There are two sections of the Bankruptcy Code addressing sanctions for bad faith filing upon dismissal.  Section 109(g) provides in pertinent part:

> Notwithstanding any other provision of this section, no individual or family farmer may be a debtor under this title who has been a debtor in a case pending under this title at any time in the preceding 180 days if-
> (1) the case was dismissed by the court for willful failure of the debtor to abide by orders of the court, or to appear before the court in proper prosecution of the case; or
> (2) the debtor requested and obtained the voluntary dismissal of the case following the filing of a request for relief from the automatic stay provided by section 362 of this title.

11 U.S.C. § 109(g).

Section 349(a) provides:

> Unless the court, for cause, orders otherwise, the dismissal of a case under this title does not bar the discharge, in a later case under this title, of debts that were dischargeable in the case dismissed; nor does the dismissal of a case under this title prejudice the debtor with regard to the filing of a subsequent petition under this title, except as provided in section 109[g] of this title.

11 U.S.C. § 349(a).

The Tenth Circuit, in *Frieouf v. United States* (*In re Frieouf*), 938 F.2d 1099, 1103-04 (10th Cir. 1991), held that under § 109(g), courts in this Circuit can bar a debtor from re-filing a petition for a maximum of 180 days. [18]   The Circuit has not placed a time limit, however, on

---

[18]  This is the minority view.  *Casse v. Key Bank Nat'l Ass'n (in re Casse)*, 198 F.3d 327, 336 (2nd Cir. 1999); *see also In re Narod*, 138 B.R. 478, 484 (E.D.Pa.1992) (stating the court may preclude additional bankruptcy filings by the debtor within "whatever time period the court deems reasonable").

bars to discharge under § 349(a).   *See In re Guebert*, 2008 WL 1744777 (Bankr. D. Kan. 2008) (citing *Frieouf* and barring discharge of debts in future cases under § 349(a)).

In this case, the Court finds the Debtor has not appeared before this Court in proper prosecution of her case.  As her testimony reveals, from the start, the Debtor was not forthcoming with this Court or her creditors about the true extent of her assets, liabilities, income, and expenses, while continuing to seek confirmation of multiple deficient chapter 13 plans.  Therefore,  the Court first finds grounds exist to impose a reasonable time period sufficient in length to allow the Debtor and her creditors to determine their respective disputes in state court, and this Court does not hesitate to order that dismissal is with prejudice to Debtor's filing of another case for 180 days from the date of this Order.  Indeed, if it could under Tenth Circuit precedent, the Court would order a longer bar.

Second, the Court finds the abusive conduct in this case warrants an order preventing discharge of debts dischargeable in this case in future bankruptcy cases under §349(a).  Therefore, any debt owed by the Debtor as of the filing of her chapter 13 case shall not be discharged in a subsequent case filed by Debtor, unless and until the Debtor and her creditors have either resolved their disputes amongst themselves, or obtained final orders from the state courts determining their disputes, and a subsequent bankruptcy court has ruled whether these debts are dischargeable or not.  *See In re Norton*, 319 B.R. 671 (Bankr. D. Utah 2005) (reasoning that "a bad faith determination under § 349(a) is akin to the same determination under § 1307(c)" and that courts should employ § 349(a) when a debtor's conduct is "more egregious" than that involved when applying § 109(g)).

Third, should Debtor attempt to re-file and maintain a bankruptcy case after 180 days, but within three years, of the date of this Order, she shall provide, in addition to the filing of her bankruptcy petition and related schedules and statements, a report on the status of any state proceedings involving the debts at issue in this case.  Debtor shall provide notice of the renewed filing and of the report to all creditors in the current chapter 13 case and any additional as yet undisclosed or subsequent creditors, giving them the opportunity to object to the voluntary bankruptcy filing.  Thereafter, the Court will determine if the Debtor may continue to maintain the new bankruptcy case. *See, e.g., In re Gros*, 173 B.R. 774, 777 (Bankr. M.D. Fla. 1994) (barring filing of another bankruptcy petition without specific permission from the court).

Finally, should creditors find state court proceedings to be unavailing, or their interests are otherwise jeopardized by Debtor, the Court does not, by its decision, prohibit the filing of a properly filed and noticed involuntary Chapter 7 case against Debtor under § 303.

Accordingly, it is **HEREBY ORDERED** that Debtor's case is **DISMISSED with prejudice** as set forth above.  A separate judgment shall enter.

Dated:   December 8, 2016.

BY THE COURT:

*Howard Tallman*

Howard R. Tallman, Judge
United States Bankruptcy Court